MAINE SUPREME JUDICIAL COURT                           Reporter of Decisions
Decision:    2015 ME 75
Docket:      Pen-14-139
Argued:      December 10, 2014
Decided:     June 18, 2015

Panel:       ALEXANDER, GORMAN, JABAR, HJELM, and CLIFFORD, JJ.
Majority:    GORMAN, JABAR, and HJELM, JJ.
Concurrence/
  Dissent:   ALEXANDER, J.
Dissent:     CLIFFORD, J.

ELIZABETH BROWN

v.

DELTA TAU DELTA et al.

JABAR, J.

[¶1]   Elizabeth Brown appeals from the Superior Court's (Penobscot County, *Cuddy, J.*) entry of a summary judgment in favor of Delta Tau Delta (DTD) and Delta Tau Delta National Housing Corporation (DTDNHC) on her claims arising out of events that occurred at the fraternal organization's Gamma Nu chapter[1] located on the University of Maine's Orono campus (UMO).  Brown argues that the court erred in concluding that neither DTD nor DTDNHC owed her a duty of care sufficient to support her negligence claims, and in dismissing her claims seeking to hold DTD and DTDNHC vicariously liable.  Because we

---

[1]  Because the fraternity's local chapter is an unincorporated association of undergraduate students, it is not susceptible to being sued in its own name, though its individual members are amenable to suit for their individual negligent conduct.  *See K & S Servs., Inc. v. Schulz Elec. Grp. of Cos.*, 670 F. Supp. 2d 91, 93 (D. Me. 2009); *Tisdale v. Rawson*, 2003 ME 68, ¶ 15, 822 A.2d 1136; *Libby v. Perry*, 311 A.2d 527, 534 (Me. 1973).

conclude that DTD owed a duty to its collegiate chapters' social invitees sufficient to support Brown's claim based on premises liability, we vacate that portion of the summary judgment. We affirm the summary judgment on the remaining claims against DTD. We also affirm and do not further discuss the summary judgment as to DTDNHC because there is nothing in the record suggesting that the property-holding corporation had a duty, based on premises liability or otherwise, to Gamma Nu's social invitees.

## I. BACKGROUND

[¶2] Viewed in the light most favorable to Brown, as the nonmoving party, the summary judgment record establishes the following facts. *See Budge v. Town of Millinocket*, 2012 ME 122, ¶ 12, 55 A.3d 484.

[¶3] On September 17, 2010, Gamma Nu hosted a party at its DTD fraternity house that was restricted to invited guests only. Brown, a UMO student, was invited to the party by Joshua Clukey, a member of Gamma Nu. Brown arrived at the fraternity house between 11:00 and 11:30 p.m. and found Clukey. Brown and Clukey, who had both been drinking alcoholic beverages, went upstairs to Clukey's room, past a fraternity member whose function was to limit access to the upper floors to residents and their guests. Inside his room, Clukey sexually assaulted Brown and prevented her from leaving the room for several minutes.

[¶4]   The day after the party, Brown reported the incident to the fraternity president, who told her "the fraternity had been concerned about Clukey for a while" because he had developed a drinking problem and had recently caused property damage and engaged in fights with other fraternity brothers.   The fraternity president reported the incident involving Brown to the chapter consultant, who is employed by the national fraternity, DTD.  The following week, the local chapter expelled Clukey from the fraternity for engaging in conduct unbecoming a member and for violating the national fraternity's code of conduct and rules regarding alcohol and hazing.  Clukey was notified of his expulsion by letter from the national fraternity.

[¶5]   On September 11, 2012, Brown filed a civil complaint against Clukey, DTD,[2] and DTDNHC.[3]  DTDNHC is an Indiana non-profit corporation that holds property for DTD and leases the fraternity house to Gamma Nu.  DTD is a national non-profit corporation organized in New York and doing business in Indiana; Gamma Nu is its local chapter at UMO.  DTD's purpose is to advance its mission and values by providing resources to local chapters and regulating them through risk management policies, a member code of conduct, and oversight by chapter

---

[2]   According to DTD, it was inaccurately named in the complaint; its name is actually Delta Tau Delta Fraternity, Inc.

[3]   DTDNHC was substituted as a defendant for Delta Tau Delta Building Corp. (DTDBC), which was named in the original complaint.  DTDBC is a now-defunct Maine non-profit corporation that leased property to Gamma Nu in Orono in the 1990s, but sold the property to DTDNHC in 1998.

consultants and alumni advisors. DTD's constitution and by-laws set forth an intricate hierarchy of rules and regulations "to provide for the effective organization of [fraternity] operations on the international, division, and chapter levels," including member initiation regulations, implementation of national Member Responsibility Guidelines (MRGs), and enforcement mechanisms.

[¶6]    Brown's initial complaint alleged counts of assault and false imprisonment against Clukey, and vicarious liability against both DTD and DTDNHC.   Through subsequent amendments to her complaint, Brown added counts of negligence, premises liability, and negligent infliction of emotional distress against Clukey, DTD, and DTDNHC, and requested recovery of punitive damages from Clukey.

[¶7]  In October 2013, Clukey was dismissed from the case with prejudice following Brown's settlement of her claims against him.  On January 29, 2014, the court granted DTD and DTDNHC's motion to dismiss with respect to the issue of vicarious liability and denied the motion in all other respects.  After entry of this order, Brown's remaining counts against DTD and DTDNHC alleged negligence, negligent infliction of emotional distress, and premises liability.  On March 17, 2014, the court granted DTD and DTDNHC's motion for summary judgment, concluding that neither DTD nor DTDNHC owed Brown a duty of care.  Brown appeals.

## II. DISCUSSION

[¶8]   Because there is nothing in the record suggesting that Clukey was acting as an agent of DTD or DTDNHC at the time of the assault, we reject Brown's vicarious liability claims and focus only on her claims of negligence.  We review de novo the court's entry of summary judgment in favor of DTD based upon the legal determination that DTD did not owe Brown a duty of care.  *See Estate of Cabatit v. Canders*, 2014 ME 133, ¶ 8, 105 A.3d 439.

A.    Duty

[¶9]   Even though the issue is fact driven, the question of duty is a legal question decided by the court, not the jury.  *See Michaud v. Great N. Nekoosa Corp.*, 1998 ME 213, ¶ 15, 715 A.2d 955.  Because it is a mixed question of law and fact, the facts in any given case will determine whether an entity has a duty to the putative plaintiff.  *See Cameron v. Pepin*, 610 A.2d 279, 282 (Me. 1992).  This is a multi-factored analysis that necessarily evokes policy-based considerations including the just allocation of loss.  *See id*.

[¶10]   The undisputed facts in this case do not give rise to a duty beyond that related to Brown's premises liability claim.  Specifically, the summary judgment record reveals no "special relationship" between Brown and DTD sufficient to sustain Brown's general negligence claim, *see DeCambra v. Carson*, 2008 ME 127, ¶¶ 11-12, 953 A.2d 1163 (holding that, absent a special relationship

between the parties, "there is no general obligation to protect others from the actions of third parties, even where one knows the third party is or could be dangerous"), nor does it reveal a special relationship or facts that would give rise to bystander liability sufficient to support Brown's negligent infliction of emotional distress claim, *see Curtis v. Porter*, 2001 ME 158, ¶¶ 18-19, 784 A.2d 18 (holding that, except in bystander liability claims or when "a special relationship exists between the actor and the person emotionally harmed," there is "no . . . general duty to avoid negligently causing emotional harm to others"). However, as our discussion will illustrate, the facts here give rise to a question of duty founded on premises liability. The issue is thus whether, based on the factual record, the national fraternity has a duty to exercise reasonable care for the safety of its local chapter's social invitees during functions sponsored by the local chapter and held at the DTD fraternity house.

[¶11] We have determined that a duty founded on premises liability exists between a university and its business invitees. *Stanton v. Univ. of Me. Sys.*, 2001 ME 96, ¶¶ 8, 10, 773 A.2d 1045. In *Stanton*, a visiting student at the University of Southern Maine was sexually assaulted in her dormitory room. *Id*. ¶¶ 2-3. We held that, in light of the relationship between the University as the owner of the dormitory and the female student as its business invitee, as well as the foreseeability of a sexual assault occurring within a dormitory room, "the

University owed a duty to reasonably warn and advise students of steps they could take to improve their personal safety." *Id*. ¶¶ 8-10; *see also Schultz v. Gould Acad*., 332 A.2d 368, 370 (Me. 1975) ("Plaintiff, as a student attending the defendant Academy, had the legal status of a business invitee, to whom defendant's employee owed a duty to exercise reasonable care in taking such measures as were reasonably necessary for [the student's] safety in light of all then existing circumstances.")

[¶12] Though we have not previously addressed the question of a national fraternity's duty to its local chapter's social invitees, courts in other jurisdictions condition the existence of a duty on the extent of the national fraternity's control over the local chapter. In *Grenier v. Comm'r of Transp.*, 51 A.3d 367, 373-74, 389 (Ct. 2012), the Connecticut Supreme Court considered whether a national fraternity's level of involvement with its local chapter was sufficient to give rise to a duty of care owed by the fraternity to a local member who suffered fatal injuries in an automobile accident while returning from a chapter event. Noting that different courts had reached different conclusions, the *Grenier* court held,

> Ultimately, whether a national fraternity may be held liable for the actions of one of its local chapters depends both on its ability to exercise control over the local chapter as well as its knowledge either that risk management policies are not being followed or that the local chapter is engaging in inappropriate behavior.

8

*Id*. at 388. In reversing summary judgment entered in favor of the national fraternity, the court considered evidence that the fraternity provided financial resources to, imposed risk management standards on, and maintained supervisory and enforcement authority over the local chapter. *Id*. at 389. It also considered evidence that the national fraternity conducted chapter leadership training and regulated member conduct through rules and regulations, including those related to the use of alcohol. *Id*.

[¶13] In *Morrison v. Kappa Alpha Psi Fraternity*, 738 So. 2d 1105, 1118 (La. Ct. App. 1999), the Louisiana Court of Appeal determined that a national fraternity owed a duty to protect a pledge from injuries caused during its local chapter's hazing activities when the national organization was aware of prior hazing activities at that chapter. In that case, the national fraternity was "responsible for all that [went] on in its chapters, as it ha[d] the right to control intake, expel or suspend members, and revoke charters"; had officers and alumni advisors responsible for auditing and supervising local chapters' compliance with fraternity rules; and had educational programs and workshops "to address the problem of hazing." *Id*. *But see Walker v. Phi Beta Sigma Fraternity*, 706 So. 2d 525, 529 (La. Ct. App. 1997) (concluding that a national fraternity with no notice of hazing activities and no authority to control the day-to-day activities of a

local chapter had no duty to protect a member from hazing injuries despite the national organization's general anti-hazing policy).

[¶14] As these cases illustrate, the inquiry as to the existence of a duty is fact-intensive. Here, we look to general principles of duty, with particular emphasis on the undisputed facts relevant to foreseeability, control, and the relationship of the parties, in determining whether a duty founded on premises liability exists between DTD and its local chapter's social invitees. *See Stanton*, 2001 ME 96, ¶ 8, 773 A.2d 1045; *Hughes v. Beta Upsilon Bldg. Ass'n*, 619 A.2d 525, 527 (Me. 1993) ("[Duty] arises only from a relationship that society recognizes as sufficient to create the duty. Just as control and foreseeability are factors in a duty analysis, so is the relationship of the parties."). For the following reasons, the facts in this case dictate our holding.

1. Foreseeability

[¶15] Over a decade ago, we recognized that sexual assaults could foreseeably occur in a dormitory room on a college campus. *Stanton*, 2001 ME 96, ¶ 10, 773 A.2d 1045. Certainly, nothing has occurred during the past fourteen years to make such events less foreseeable. It is similarly foreseeable that allowing a group of eighteen-to-twenty-year-olds control over a residence where alcohol-related parties are held presents the potential for misconduct, including sexual assault. A national fraternity knows, or should know, that social events

carried on in a building that houses one of its local chapters presents the potential for sexual assault, particularly where alcohol consumption is an integral part of the event.

[¶16]  The mechanisms through which DTD controls the behavior of its members, discussed below, demonstrate its awareness of these potential problems. DTD's "Policy on Alcohol and Substance Abuse," which is integrated into the MRGs, recognizes that the "well known dangers of alcohol and substance abuse" may be manifested by "relationship problems, including inappropriate sexual behavior [or] harassment."  The MRGs also state:

> The Fraternity will not tolerate or condone any form of abusive behavior, including sexist or sexually abusive behavior, on the part of its members, whether physical, mental or emotional . . . . This is to include any actions, activities, or events, whether on chapter premises or an off-site location directed toward members or non-members or any actions which are demeaning to women or men . . . . Such behavior includes . . . sexual assault.

[¶17]  DTD's policies recognize the self-evident potential for excessive drinking and sexual abuse within the fraternity setting.  These policies would make little sense unless such activities were foreseeable.  *See Stanton*, 2001 ME 96, ¶ 10, 773 A.2d 1045 ("That a sexual assault could occur in a dormitory room on a college campus is foreseeable and that fact is evidenced in part by the security measures that the University had implemented."); *Mullins v. Pine Manor Coll.,* 449 N.E.2d 331, 337 (Mass. 1983).

## 2.    Control

[¶18]  The undisputed facts of this case demonstrate both DTD's authority to control its members as well as its actual control.  Through its constitution, by-laws, and administrative connection to its local chapters' day-to-day activities, DTD exercises significant control over its individual members.

[¶19]  DTD requires each local chapter to adopt local by-laws that do not conflict with the national constitution or by-laws.  Local chapter by-laws are expected to address local risk management plans that supplement the national MRGs; implement DTD's alcohol education program, *Delts Talking About Alcohol*; and require all members to sign the national code of conduct.  Each chapter must provide a certified copy of its by-laws, and any amendments thereto, to the national central office.

[¶20]  As part of the chapter accreditation process, the MRGs must be presented to the local chapters' pledges and members by October 25 of each year. The MRGs set out the rules and regulations to which every member is expected to adhere.  In addition to those provisions already discussed, they provide that:

9.    Drunkenness by members and pledges will be classified as "conduct unbecoming a member of the Fraternity" as defined in . . . the Fraternity's Constitution.

10.   Every chapter will implement the Fraternity's primary alcohol education program . . . .

12

> 11. No members . . . shall purchase for, serve to, or sell alcohol beverages to any minor . . . .
>
> 12. No member . . . shall permit, tolerate, encourage or participate in "drinking games."

The MRGs also set out specific rules and regulations pertaining to conduct by its members at social events held by the local chapter.

[¶21]  The national code of conduct, which DTD requires each of its members to sign, sets out the behavioral standards to which every member is expected to conform.  The code requires members to refrain from sexual abuse and the abuse of alcohol, and also prohibits physical or psychological hazing and the use of illegal drugs.  DTD requires each chapter president to, among other things, enforce compliance with the code of conduct and DTD's rules and regulations.

[¶22]  DTD's constitution also provides that each local chapter shall have an alumni advisor, who acts within the local chapter as a deputy for the Arch Chapter, which is the national organization's governing body.  The chapter advisor's duties include overseeing and advising the local chapter to ensure compliance with the rules and guidelines set forth by the national organization and reporting back to DTD regarding the chapter's activities.  In addition, a chapter consultant visits each local chapter at least once per semester.  Chapter consultants meet with local fraternity leadership and alumni advisors, inquire into chapter operations, provide feedback for improvements, and report back to DTD's central office.  These

consultants also report potential violations of DTD rules by the local chapters to their supervisors at DTD, who then investigate the infractions and sanction the chapter as necessary.

[¶23] DTD also has a comprehensive process for disciplining members who violate its rules or regulations. The MRG enforcement criteria designate three categories of MRG violations of increasing severity. All incidents of misconduct must be reported to the national office, and a member charged with an infraction has due process rights to notice and a hearing, which necessarily run through the Arch Chapter. DTD has broad authority to impose sanctions, which may include mandating educational workshops, imposing fines, conducting membership review, revoking a chapter's privilege to hold events with alcohol, revoking a chapter's charter, or suspending or expelling individual members. In short, the national fraternity does more than simply suggest that its members conform to certain norms; it enforces its rules, regulations, and codes of conduct through constant monitoring, oversight, and intervention.

3. Relationship

[¶24] The same elements by which DTD controls its members—its chain of command, its articulation and imposition of its code of conduct, and its process for disciplining members who do not comply with its rules—also establish a close relationship between the national fraternity and its local chapters and individual

members. DTD imposes a complex hierarchy of rules and regulations upon its local chapters and individual members, and its constitution sets out a clear command structure to which local chapters must adhere.

[¶25] In addition to the alumni representatives that the national fraternity requires within each chapter, the national chain of command provides for a chapter advisor whose full-time job is to monitor and provide oversight of the functioning of the local chapter, to "assist the undergraduate chapter in understanding and living the Mission and Values of the Fraternity," and to report to DTD on a regular basis. The DTD constitution provides that the division president, an officer of the national fraternity, appoints these advisors, as well as the assistant chapter advisors. These constitutional officers provide a direct link between the national fraternity and each local chapter.

[¶26] Through its comprehensive articles and clearly defined power structure, DTD expressly reaches into the day-to-day affairs of its local chapters and creates a close, mutually beneficial relationship with its individual members.

B.    Conclusion

[¶27] We conclude that the foreseeability, control, and relationship factors present here are sufficient to impose upon DTD a duty founded on premises liability. *See Stanton*, 2001 ME 96, ¶¶ 8, 10, 773 A.2d 1045. This case involves the responsibility of a national organization, DTD, which provided its name, its

credibility, its corporate structure, and its code of conduct to a local branch on a college campus. DTD effectively handed over a residential building to a group of college students, and in doing so it should have anticipated that alcohol-related parties on the premises would follow, as could the social problems that accompany such activities. It therefore had a duty to exercise reasonable care in providing a reasonably safe environment for any social invitee to an event at the fraternity house. Imposing upon a national fraternity that integrates itself into its local chapter and onto a college campus a duty to take reasonable steps to protect the safety of social invitees at its fraternity house is no more onerous or unexpected than the duty society imposes upon a university to exercise care in the administration of its dormitories.

[¶28] DTD had the authority to control its individual members, and actually did so through implementation and enforcement of its rules and regulations. DTD also had a close, integrated relationship with Gamma Nu, as demonstrated by DTD's corporate structure. Finally, it is certainly foreseeable that turning a fraternity house over to college students, where parties and alcohol-related events are likely to occur, creates the potential for sexual misconduct—a known safety issue on college campuses.

[¶29] We conclude that DTD had a duty to exercise reasonable care and take reasonable steps to provide premises that are reasonably safe and reasonably

free from the potential of sexual misconduct by its members, for all social invitees to chapter-sponsored events. Our finding of a duty does not establish any liability on the part of DTD. Brown still has the obligation to convince a fact-finder that there was a breach of that duty, and that the breach was the cause of her injuries.

The entry is:

> Dismissal of vicarious liability claims affirmed. Summary judgment in favor of Delta Tau Delta on the premises liability claim vacated; summary judgment on the remaining counts affirmed. Summary judgment in favor of Delta Tau Delta Housing Corporation affirmed. Remanded for further proceedings consistent with this opinion.

---

ALEXANDER, J., concurring/dissenting.

[¶30] The Court has thoroughly researched the law and presented the facts of this case. I concur with the Court that we must vacate the trial court's judgment. However, based on the facts and conclusions stated in the Court's opinion, and the law the Court's opinion cites, I must respectfully dissent from the Court's holdings that only a premises liability claim against Delta Tau Delta (DTD) should proceed to trial and that the Delta Tau Delta National Housing Corporation (DTDNHC), the owner of the building, should be dismissed from the case entirely. Because important disputes as to material facts remain, the premises liability, negligence,

and negligent infliction of emotional distress claims against DTD and DTDNHC should be left for a jury to decide.

## I. RELEVANT FACTS

[¶31] Foreseeability is one of the touchstones for attaching legal liability. *Stanton v. Univ. of Me. Sys.*, 2001 ME 96, ¶¶ 8, 10, 773 A.2d 1045. As the Court's opinion recognizes, sexual assault on college and university campuses is, unfortunately, a foreseeable event. To begin the discussion, it is important to quote the facts and conclusions stated in the Court's opinion that, in my view, support the conclusion that a jury should be allowed to decide the claims against both defendants.

(1) "A national fraternity knows, or should know, that social events carried on in a building that houses one of its local chapters presents the potential for sexual assault, particularly where alcohol consumption is an integral part of the event." Court's Opinion ¶ 15.

(2) "It is similarly foreseeable that allowing a group of eighteen-to-twenty-year-olds control over a residence where alcohol-related parties are held presents the potential for misconduct, including sexual assault." Court's Opinion ¶ 15.

(3) "[I]t is certainly foreseeable that turning a fraternity house over to college students, where parties and alcohol-related events are likely to occur,

creates the potential for sexual misconduct—a known safety issue on college campuses." Court's Opinion ¶ 28.

(4) "DTD effectively handed over a residential building to a group of college students, and in doing so it should have anticipated that alcohol-related parties on the premises would follow, as could the social problems that accompany such activities. It therefore had a duty to exercise reasonable care in providing a reasonably safe environment for any social invitee to an event at the fraternity house." Court's Opinion ¶ 27.

(5) "Imposing upon a national fraternity that integrates itself into its local chapter and onto a college campus a duty to take reasonable steps to protect the safety of social invitees at its fraternity house is no more onerous or unexpected than the duty society imposes upon a university to exercise care in the administration of its dormitories." Court's Opinion ¶ 27.

(6) "DTD had the authority to control its individual members, and actually did so through implementation and enforcement of its rules and regulations. DTD also had a close, integrated relationship with Gamma Nu, as demonstrated by DTD's corporate structure." Court's Opinion ¶ 28.

(7) "DTD had a duty to exercise reasonable care and take reasonable steps to provide premises that are reasonably safe and reasonably free from the potential

of sexual misconduct by its members, for all social invitees to chapter-sponsored events." Court's Opinion ¶ 29.

(8) "DTD is a national non-profit corporation organized in New York and doing business in Indiana; Gamma Nu is its local chapter at UMO." Court's Opinion ¶ 5.

(9) "DTDNHC is an Indiana non-profit corporation that holds property for DTD and leases the fraternity house to Gamma Nu." Court's Opinion ¶ 5.

(10) "Because the fraternity's local chapter is an unincorporated association of undergraduate students, it is not susceptible to being sued in its own name, though its individual members are amenable to suit for their individual negligent conduct." Court's Opinion ¶ 1 n.1.

(11) "The same elements by which DTD controls its members—its chain of command, its articulation and imposition of its code of conduct, and its process for disciplining members who do not comply with its rules—also establish a close relationship between the national fraternity and its local chapters and individual members." Court's Opinion ¶ 24.

(12) "DTD imposes a complex hierarchy of rules and regulations upon its local chapters and individual members, and its constitution sets out a clear command structure to which local chapters must adhere." Court's Opinion ¶ 24.

(13) "Brown and Clukey, who had both been drinking alcoholic beverages, went upstairs to Clukey's room, past a fraternity member whose function was to limit access to the upper floors to residents and their guests. Inside his room, Clukey sexually assaulted Brown and prevented her from leaving the room for several minutes." Court's Opinion ¶ 3.

(14) "The day after the party, Brown reported the incident to the fraternity president, who told her 'the fraternity had been concerned about Clukey for a while' because he had developed a drinking problem and had recently caused property damage and engaged in fights with other fraternity brothers." Court's Opinion ¶ 4.

[¶32] These facts and conclusions, quoted from the Court's opinion, support the three theories of liability against both defendants. They also support several inferences from the facts that, according to the reasonable dispute as to material fact standard, are sufficient to avoid a summary judgment. Those inferences are:

[¶33] First, DTDNHC's ownership of the Orono chapter's real estate, and creation of the local chapter as an unincorporated association of students, is part of a sophisticated legal mechanism, managed by DTD, to attempt to immunize its local chapter real estate from court process and liability for foreseeable lawsuits claiming injury from underage drinking, excessive drinking, sexual assaults, and

other claims that, as the Court recognizes, are the foreseeable result of ceding control of the real estate to eighteen- to twenty-two-year-olds.

[¶34] Second, considering the risks that the Court recognizes are foreseeable, DTD knows or should know that its so-called member responsibility guidelines will not be enforced.

[¶35] Third, the stairs monitor, who apparently was tasked with watching for potential problems, allowed a person who was known to be destructive and have a drinking problem—and who had been drinking that night—to take a young woman upstairs to the bedroom areas of the fraternity.

## II. LEGAL ANALYSIS

[¶36] The record demonstrates that DTD and DTDNHC are closely related entities, with DTDNHC being DTD's agent for owning the real estate of its local chapters. As the owner of the real estate, DTDNHC, like DTD, is charged with knowledge of the foreseeable risks from use of its real estate, and is responsible when there is injury resulting from a breach of the duty of care to guard against those foreseeable risks. To hold otherwise, as the Court suggests, would declare that an owner of a premises is not liable for a premises liability claim.

[¶37] To establish liability for DTDHNC, one need look only to the principal precedent cited by the Court, *Stanton*, 2001 ME 96, 773 A.2d 1045. The Court's opinion recognizes that in *Stanton*, the University, "as the owner of the

dormitory," Court's Opinion ¶ 11, was the entity with legal responsibility in the action for sexual assault arising from a breach of the University's duty of care. *Stanton*, 2001 ME 96, ¶¶ 8-10, 773 A.2d 1045. DTDNHC, the "owner of the dormitory" here, is similarly liable to respond to the pending claims for premises liability, negligence, and negligent infliction of emotional distress.

[¶38] We have long held that owners of educational institution property have a legal duty to exercise reasonable care toward students and others reasonably anticipated to be on the premises. *See Schultz v. Gould Acad.*, 332 A.2d 368, 369, 372 (Me. 1975) (reinstating a jury verdict resulting from the sexual assault of a student in a school dormitory). "[T]he law of Maine is that the owner of premises owes a legal duty to his business invitees to protect them from those dangers reasonably to be foreseen . . . ." *Id*. at 371; *see also Isaacson v. Husson Coll.*, 332 A.2d 757, 759, 765 (Me. 1975) (affirming a verdict resulting from a student's slip and fall on a college walkway). Owners of fraternity property, here DTDNHC, have similar responsibility.

[¶39] Our opinions in *Schultz*, 332 A.2d at 369, and *Isaacson*, 332 A.2d at 758, described them as negligence actions, not premises liability actions. Here, the Court attempts to distinguish the premises liability and negligence claims and holds that the premises liability claim may proceed, but the negligence claim may not. To do so, the Court cites *Stanton*, 2001 ME 96, ¶¶ 8, 10, 773 A.2d 1045,

apparently to suggest that there is some distinction between premises liability and negligence. If that is the suggestion, it is a misreading of *Stanton*. In *Stanton*, we characterized the legal question presented as one of "Negligence," and we described "a *prima facie* case of negligence." *Id*. ¶ 7. Then we stated: "We have determined that a duty founded on premises liability exists between a student and a college or other educational institution." *Id*. ¶ 8. (citing *Schultz*, 332 A.2d at 370). Concluding the negligence–premises liability discussion, we observed: "[T]he court erred in granting summary judgment to the University on the *negligence* claim." *Id*. ¶ 11 (emphasis added).

[¶40] In our prior opinions, we have not established any distinct elements separating a negligence claim from a premises liability claim. "A *prima facie* case of negligence requires a plaintiff to establish the following elements: a duty owed, a breach of that duty, and an injury to the plaintiff that is proximately caused by a breach of that duty." *Stanton*, 2001 ME 96, ¶ 7, 773 A.2d 1045. The facts and conclusions stated in the Court's opinion establish the duty, and that there is a dispute of material fact as to breach of that duty causing injury to the plaintiff. Brown's negligence claim and premises liability claim, if there is any distinction between the two, against both DTD and DTDNHC, have disputes of material fact regarding breach of duty and causation that bar summary judgment in favor of either defendant.

[¶41]  To prevail on her negligent infliction of emotional distress claim, Brown will have to prove by a preponderance of the evidence that:

(1)  DTD and/or DTDNHC were negligent;

(2)  Emotional distress to Brown was a reasonably foreseeable result of the defendants' negligent conduct; and

(3)  Brown suffered serious emotional distress as a result of the defendants' negligence.

*See Maine Jury Instruction Manual* § 7-70 at 7-95 (2015 ed.).

[¶42]  The above discussion demonstrates that Brown is entitled to a trial on her negligence claims against DTD and DTDNHC.  If she proves negligence, then it is likely that Brown would be able to prove foreseeability and serious emotional distress if, as the record suggests, Brown was sexually assaulted, held against her will, and placed in fear of an imminent, more serious sexual attack.  Certainly, at this pretrial stage, there remains a dispute of material fact as to these issues.

[¶43]  Accordingly, with fact disputes remaining, the trial court's grant of summary judgment should be vacated and Brown's claims of premises liability, negligence, and negligent infliction of emotional distress should proceed to trial against both DTD and DTDNHC.

———————————

CLIFFORD, J., dissenting.

[¶44]  Because I agree with the Superior Court that Delta Tau Delta Fraternity, Inc. (DTD) did not have a duty of care running to social invitees of members of the fraternal organization's Gamma Nu chapter located on the University of Maine at Orono campus, I respectfully dissent.  I agree with the Court's determinations that the entry of summary judgment in favor of Delta Tau Delta National Housing Corporation was proper, and that DTD did not have a duty of care for purposes of Brown's negligence and negligent infliction of emotional distress claims.  I disagree, however, that DTD had a duty of care to prevent the intentional torts of a member against that member's social invitee for purposes of a premises liability claim.  The undisputed facts demonstrate that (A) DTD did not have control of the premises or the resident members of the local chapter; (B) there was no special relationship between DTD and Brown, the injured party in this case, that would create a duty in DTD to protect her—a member's social invitee—from the member's intentional torts; and (C) DTD did not assume a duty.  Finally, even if there were a duty, I disagree with the overly expansive description of that duty provided by the Court in its opinion.

## I.  EXISTENCE OF A DUTY OF CARE

[¶45]  To succeed in a premises liability claim, which is a particularized application of general negligence law, Brown must first establish the existence of a

duty in DTD "to use reasonable care to all persons lawfully on the premises." *Quadrino v. Bar Harbor Banking & Trust Co.*, 588 A.2d 303, 304 (Me. 1991) (quotation marks omitted). This duty must run from DTD to Brown, who was a social invitee of a member of a local chapter who resided in a building owned by a holding company affiliated with DTD and occupied by local chapter members.

[¶46] There are no material disputes regarding the facts that are relevant in determining whether DTD had a duty of care, and the court's entry of summary judgment in favor of DTD on the legal question of duty is reviewed de novo. *See Estate of Cabatit v. Canders*, 2014 ME 133, ¶ 8, 105 A.3d 439 (stating that a plaintiff has the burden, in defending against a defendant's motion for summary judgment, "to make out the prima facie case"); *Estate of Cummings v. Davie*, 2012 ME 43, ¶ 9, 40 A.3d 971 (stating that the question of duty is a legal question).

[¶47] For purposes of determining, as a matter of law, whether there is a duty, the relevant considerations are the degree of control exercised by the defendant, the foreseeability of injury, and the relationship of the parties. *Hughes v. Beta Upsilon Bldg. Ass'n*, 619 A.2d 525, 527 (Me. 1993). A duty "arises only from a relationship that society recognizes as sufficient to create the duty. Just as control and foreseeability are factors in a duty analysis, so is the relationship of the parties." *Id.*

[¶48]   There is no real question that the type of injury suffered by Brown was foreseeable.   *See Stanton v. Univ. of Me. Sys.*, 2001 ME 96, ¶ 10, 773 A.2d 1045 (holding that sexual assaults in college housing are foreseeable). Thus, to determine whether DTD had a duty of reasonable care to provide safe premises free from members' tortious conduct, the relevant considerations are (A) the degree of control exerted by DTD over the premises, (B) the nature of the relationship that DTD had with social invitees visiting Gamma Nu's members in the building, and (C) whether, although no duty otherwise existed, DTD voluntarily assumed a duty of reasonable care to provide safe premises.

A.     Degree of Control Exercised by DTD

[¶49]   In a premises liability case, a plaintiff must establish that the defendant was in control of *the premises*.   *See Stewart v. Aldrich*, 2002 ME 16, ¶ 10, 788 A.2d 603 (holding that a landlord is generally not responsible for a dangerous condition that starts after a tenant "takes exclusive possession and control of the premises"); *see also Rogers v. Sigma Chi Int'l Fraternity*, 9 N.E.3d 755, 760 (Ind. Ct. App. 2014) ("In order to have the occupation or control of premises necessary to impose a legal duty with respect to the condition or use of those premises, one must ordinarily have the power and the right to admit individuals to the premises, or to exclude them from the premises." (quotation marks omitted)).   As the Restatement (Third) of Torts: Liability for Physical

& Emotional Harm § 49 (2012) provides, a "possessor of land" is generally "a person who occupies the land and controls it."

[¶50] In each of the cases cited by the Court, the duty of care under consideration was a general negligence duty of care not connected to control of the premises. *See Grenier v. Comm'r of Transp.*, 51 A.3d 367, 372-74, 387-89 (Conn. 2012) (reviewing a summary judgment on a negligence claim arising from an automobile collision that occurred off the premises and resulted in a pledge's death); *Morrison v. Kappa Alpha Psi Fraternity*, 738 So. 2d 1105, 1110, 1117-20 (La. Ct. App. 1999) (reviewing a jury verdict on negligence claims arising from an assault, in a university dormitory room, on a student who was interested in membership).

[¶51] DTD is not the possessor, or even the owner, of the premises at issue and did not have control over the premises. An entity that is not in possession or control of the premises can be held liable in premises liability only if that party "negligently create[d] a dangerous condition on the land," in which case the party "may be liable for reasonably foreseeable harms." *Colvin v. A R Cable Servs.-ME, Inc.*, 1997 ME 163, ¶ 7, 697 A.2d 1289. The case in which this holding was reached involved allegations that a cable company negligently installed a cable box in a location that caused injury to the building manager. *Id.* ¶¶ 2-4. The facts alleged here are dissimilar because they arise not from an alteration to the premises

that rendered it unsafe but instead from the intentional conduct of an individual actually in possession of the premises.

[¶52] A national fraternity that does not own, possess, or control the house occupied by its members has no duty in premises liability to a local chapter's social invitees. *See Ostrander v. Duggan*, 341 F.3d 745, 748 (8th Cir. 2003) (holding that a national fraternity had no duty in premises liability in part because it did not own, possess, or control the house); *see also Yost v. Wabash Coll.*, 3 N.E.3d 509, 513, 516 (Ind. 2014) (holding, in a premises liability case, that a college was not liable for injuries to a fraternity pledge because it was not in control of premises leased to a local chapter of a fraternity, which had the exclusive right to possess and control the premises); *Rogers*, 9 N.E.3d at 759-61 (holding that an international fraternity had no premises liability for an assault that occurred at a local chapter's fraternity party because the premises were not owned by the fraternity or any related party and the fraternity did not exercise control over the premises).

[¶53] Here, DTD may have had some influence on its individual members' conduct, and it did have an affiliation with the owner of the premises, but neither of those facts demonstrates that DTD had the authority to control activities on the premises or its members' intentional conduct toward those members' social invitees. *See Shaheen v. Yonts*, 394 F. App'x 224, 229-30 (6th Cir. 2010) (holding

30

that a duty should not be imposed if a party has no real means of controlling behavior); *Yost*, 3 N.E.3d at 521 (holding that the national fraternity did not have a duty to a social invitee when it "lacked any direct oversight and control of the individual fraternity members").[4] In the absence of an ability to *control activities on the premises*, DTD has no duty in premises liability.

B.     Relationship Between DTD and Social Invitees of DTD Members

[¶54]  I also disagree with the Court's conclusion that a special relationship existed.  The Court speaks only of the relationship between DTD and its members. The pertinent question, however, is whether there is a special relationship between DTD and Brown, who seeks to recover damages based on her status as a social

---

[4] Even in ordinary negligence cases unrelated to premises liability, national fraternities and building associations have consistently been determined *not* to have a duty to a local chapter's social invitees when they do not provide oversight or exercise control.  *See Shaheen v. Yonts*, 394 F. App'x 224, 227-31 (6th Cir. 2010) (holding that neither the national fraternity nor the holding company for fraternity property had a presence at the local chapter house that would generate a duty to supervise and control drinking at a party in that house to prevent injury to a social invitee); *Yost v. Wabash Coll.*, 3 N.E.3d 509, 513, 520-21 (Ind. 2014) (holding that the national fraternity did not have or assume a duty to a fraternity's pledge because the national fraternity did not oversee and control individual fraternity members or involve itself in the local chapter's day-to-day management); *Grand Aerie Fraternal Order of Eagles v. Carneyhan*, 169 S.W.3d 840, 848-54 (Ky. 2005) (holding that the fraternal organization had no duty to a social invitee at a local event because it had no ability to control the local chapter alleged to have caused the harm); *Pingeton v. Erhartic*, 12 Mass. L. Rptr. 644 (Mass. Super. Ct. 2001) (concluding that, although the national fraternity had an alcohol policy for its local chapters and could discipline local chapters and members, it had no duty to social invitees because it was not present on a day-to-day basis and could not enforce discipline until after violations had occurred); *Sparks v. Alpha Tau Omega Fraternity, Inc.*, 255 P.3d 238, 244-46 (Nev. 2011) (holding that the national fraternity did not have a duty to third parties because it did not control or monitor those who attended events organized by a local chapter); *Alumni Ass'n v. Sullivan*, 572 A.2d 1209, 1209-10, 1212-13 (Pa. 1990) (holding that the national fraternity had no duty to those injured by a social invitee after drinking alcohol because it had no ability to monitor its chapters' activities and had the power to discipline only after the fact).

invitee of a local chapter member when DTD did not itself invite her to the premises.

[¶55]   A national fraternity such as DTD may well have a special relationship with its own members, but that relationship does not automatically translate into a special relationship with social invitees of those members for purposes of premises liability.   This is not a case involving a local fraternity's hazing of its pledges, *cf. Grenier*, 51 A.3d at 387-89, or of those interested in membership, *cf. Morrison*, 738 So. 2d at 1110.   Instead, this is a case involving an individual member's commission of intentional torts against the member's own guest.

[¶56]   For purposes of premises liability claims, "[o]nly when there is a special relationship, may the actor be found to have a common law duty to prevent harm to another, caused by a third party."   *Belyea v. Shiretown Motor Inn, LP*, 2010 ME 75, ¶ 9, 2 A.3d 276 (quotation marks omitted).   "There is simply no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless . . . a special relation exists . . . ."   *Id.* (alterations in original) (quotation marks omitted); *see also Hughes*, 619 A.2d at 527 (holding that nonfeasance cannot render a defendant liable unless the defendant had a duty to affirmatively protect the plaintiff from a danger that it did not create because of a special relationship with that plaintiff).

[¶57]  Only "[c]ertain narrowly defined, special relationships give rise to an affirmative duty to aid and protect, such as the relationship between a common carrier and passenger, employer and employee, parent and child, or innkeeper and guest."  *Estate of Cilley v. Lane*, 2009 ME 133, ¶ 17, 985 A.2d 481 (footnotes omitted); *see also Stanton*, 2001 ME 96, ¶ 10, 773 A.2d 1045 (holding that the University of Maine had a duty to reasonably warn and advise a student of safety measures); *Schultz v. Gould Acad.*, 332 A.2d 368, 370 (Me. 1975) (holding that a boarding school that provided security staff to protect its residents could be held liable for a failure to provide security "even though a wilful or negligent or criminal act by a third person intervened and contributed to the harm").

[¶58]  In distinguishing among relationships to determine whether a duty exists, we have held that, although an innkeeper has a duty to a guest to proactively prevent an assault if it is reasonably foreseeable, it does not have a similar duty to a patron of a lounge that operates on the inn's premises because there is no special relationship.  *Belyea*, 2010 ME 75, ¶¶ 10-12, 2 A.3d 276.  We noted in that case that "a landlord's mere ability to control [an activity of its tenant] does not give rise to a legal duty."  *Id.* ¶ 13 (alteration in original) (quotation marks omitted). Thus, even if DTD had some degree of control over activities on the premises, no duty can arise absent the necessary relationship with the injured party.

[¶59]  Here, DTD did not invite Brown to the premises, and for purposes of premises liability, she was not, as the social invitee of a fraternity member, in a special relationship with DTD, which did not own, possess, or control the local chapter house in which the intentional torts occurred.  Unlike an innkeeper in a direct contractual relationship with a lodger, *see id.*, or a boarding school or University that provides housing for its students, *see Stanton*, 2001 ME 96, ¶ 10, 773 A.2d 1045; *Schultz*, 332 A.2d at 369-70, DTD had no direct relationship with Brown as a social invitee of a member living in a house owned by a separate entity affiliated with DTD and possessed by local chapter members.  The students who were injured in *Stanton* and *Schultz* were each lodgers in school-owned dormitories in which assaults occurred.  *Stanton*, 2001 ME 96, ¶¶ 2-3, 10, 773 A.2d 1045; *Schultz*, 332 A.2d at 369-70.  Brown was instead a social invitee of a member of a local chapter of a fraternity affiliated with the holding company that owned the premises.  *See Delta Tau Delta v. Johnson*, 712 N.E.2d 968, 970-75 (Ind. 1999) (holding that, although the local chapter, which owned *and* occupied the fraternity house, had a duty to a social invitee to keep the premises safe against foreseeable sexual assault, the national fraternity did not undertake to provide security and did not assume such a duty).

[¶60]   I would conclude that, in addition to failing to demonstrate the necessary degree of control over the premises in DTD, Brown has provided

insufficient facts to support the existence of a duty because no special relationship has been shown to exist between Brown and DTD.

## C.     Assumption of Duty

[¶61]  The facts presented on summary judgment also do not raise a genuine issue of material fact with respect to whether, although no duty otherwise existed, DTD voluntarily assumed a duty of care to protect members' social invitees against members' torts on the premises.  *See Smith v. Delta Tau Delta, Inc.*, 9 N.E.3d 154, 160 (Ind. 2014).  DTD did not undertake to provide security, and the undisputed facts demonstrate only that DTD adopted disciplinary standards and implemented educational programs that were designed to promote proper conduct. A national fraternity that implements clear discipline policies and educates against sexual violence and excessive drinking should not be deemed to have thereby assumed a legally enforceable duty of care to all social invitees of individual members of local chapters.  As the Indiana Supreme Court stated, a "national organization . . . should be encouraged, not disincentivized, to undertake programs to promote safe and positive behavior and to discourage hazing and other personally and socially undesirable conduct," which it might not do if those efforts would render it liable for any misconduct of local members.  *Yost*, 3 N.E.3d at 521.

## II. SCOPE OF ANY DUTY OF CARE

[¶62]  Finally, the extent of the duty defined by the Court today is distinct from the duties determined to exist in *Stanton* and *Schultz*.  In *Stanton*, the University was determined to have "a duty to reasonably warn and advise students of steps they could take to improve their personal safety" in college dormitories—not a duty to prevent any individuals' commission of torts against other individuals.  2001 ME 96, ¶ 10, 773 A.2d 1045.  In *Schultz*, the duty at issue was a duty of care to prevent an assault "reasonably to be foreseen" based on a school security agent's observation of specific evidence of an intrusion into the girls' dormitory—not a generalized duty to prevent a sexual assault from occurring against a social invitee of an adult resident in a building that was not posted with a security guard.  332 A.2d at 371; *see also Johnson*, 712 N.E.2d at 975 (holding that a national fraternity that does not undertake to provide security services does not assume a duty of care).

[¶63]  If the Court is correct that the duty imposed is "no more onerous or unexpected than the duty society imposes upon a university to exercise care in the administration of its dormitories," Court's Opinion ¶ 27, then the duty imposed must be similar to the duty to warn of steps that could improve personal safety, *see Stanton*, 2001 ME 96, ¶ 10, 773 A.2d 1045, or the duty to prevent an assault if the national fraternity provides security services in the local chapter's house and

observes evidence of misconduct, *see Schultz*, 332 A.2d at 371. No facts demonstrating a breach of such a limited duty have been presented on summary judgment.

[¶64] The duty that the Court adopts today is, instead, a more expansive duty "to exercise reasonable care and take reasonable steps to provide premises that are reasonably safe and reasonably free from the potential of sexual misconduct by [the fraternity's] members, for all social invitees to chapter-sponsored events." Court's Opinion ¶ 29. This broad and vaguely defined duty is fundamentally at odds with basic principles of tort law. The duty of reasonable care in providing a reasonably safe premises "is not one of absolute care or of an insurer." Simmons, Zillman & Gregory, *Maine Tort Law* § 8.02 at 8-3 (2004 ed.). On the summary judgment record presented, the Court can only be understood to suggest that a national fraternity *is* such a general insurer, given that the Court has not identified which facts presented on summary judgment would, if believed, demonstrate any breach of the amorphous duty announced. *See Estate of Cabatit*, 2014 ME 133, ¶ 8, 105 A.3d 439 (requiring a plaintiff to present facts demonstrating a prima facie case for a claim to survive a defendant's motion for summary judgment). It is unclear what measures DTD was duty-bound to undertake, and it is even less clear how the evidence presented on summary judgment could demonstrate that DTD failed to undertake any such measures.

[¶65] Thus, even if any duty did exist, I would conclude that the scope of that duty could not be so broad as to require DTD, which was not present at the social gathering, to generally insure against the risk of sexual misconduct being committed on the premises by a member against a social invitee during the event. The evidence presented by Brown to establish a prima facie case is inadequate to demonstrate a breach of any appropriately limited duty that could be imposed on DTD for purposes of premises liability.

## III. CONCLUSION

[¶66] In summary, I would hold that a national fraternity does not have an expansive duty of care in premises liability running to a social invitee of an individual member of a local chapter to protect against the potential of sexual misconduct by that member when the national fraternity does not own or exercise control over the premises, does not have a special relationship with the member's social invitee, and has not assumed a duty by undertaking to provide security for or other oversight of the building. Accordingly, I would affirm the judgment of the Superior Court.

**On the briefs:**

Thomas L. Douglas, Esq., and Anne E. Schools, Esq., Douglas McDaniel Campo & Schools LLC, PA, Westbrook, for appellant Elizabeth Brown

Wendell G. Large, Esq., Carol I. Eisenberg, Esq., and Joseph L. Cahoon Jr., Esq., Richardson, Whitman, Large & Badger, Portland, for appellees Delta Tau Delta and Delta Tau Delta National Housing Corporation

**At oral argument:**

Thomas L. Douglas, Esq., for appellant Elizabeth Brown

Carol I. Eisenberg, Esq., for appellees Delta Tau Delta and Delta Tau Delta National Housing Corporation

Penobscot County Superior Court docket number CV-2012-132
FOR CLERK REFERENCE ONLY